[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1294 
In 1982, James Harvey Callahan was convicted and sentenced to death for the capital offense involving the kidnapping and murder of Rebecca Suzanne Howell in violation of Ala. Code 1975, Section 13A-5-40(a)(1). Callahan v. State, 471 So.2d 447
(Ala.Cr.App. 1983). That conviction was reversed by the Alabama Supreme Court. Ex parte Callahan, 471 So.2d 463 (Ala.), cert. denied, 474 U.S. 1019, 106 S.Ct. 567, 88 L.Ed.2d 552 (1985). In 1987, Callahan was retried, again convicted, and again sentenced to death. Seven issues are raised on this appeal from that conviction. *Page 1295 
 I
Appelant contends that the trial court erred in admitting statements made by him to law enforcement officers. His argument regarding the inadmissibility of these statements appears to be twofold: (1) the statements were involuntary and obtained without a waiver of his Fifth Amendment rights and (2) his attorney was not permitted to speak with him while one statement was being taken, thus depriving him of his Sixth Amendment right to the assistance of counsel.
 THE FACTS
Rebecca Howell disappeared on the night of February 3, 1982. Her body was discovered in Tallaseehatchee Creek in Calhoun County on February 17. Callahan was a suspect in her disappearance and murder.
On February 22, 1982, Calhoun County Deputy Sheriff Johnny Alexander had maintained surveillance on Callahan's truck for five hours before Callahan came out of his father's house and drove away at 5:00 that morning. Deputy Alexander knew that the license tag on Callahan's truck was registered to another vehicle. He also knew that Callahan was a suspect in the Howell murder, and Deputy Alexander was familiar with that investigation.
Deputy Alexander and Jacksonville Police Sergeant Kathy Thienes stopped Callahan for having a switched tag. Deputy Alexander testified that he "explained to [Callahan] that . . . the tag he had on his vehicle didn't belong to that vehicle, and that we were going to write him a ticket for a switched tag." Alexander told him that "we would have to take him to jail to write him a ticket."
At that time, the administrative policy of the sheriff's office did not permit deputies to carry "ticket books" in their vehicles. The sheriff's office was located in the county jail and the ticket book was kept there. Anyone stopped for a traffic violation was taken "to jail" where the citation was issued. This was standard procedure.
When Callahan was stopped, his conduct was suspicious and he appeared to place something behind the seat of his truck. His truck was impounded and later searched pursuant to a search warrant. See Issue II.
Deputy Alexander and Sergeant Thienes transported Callahan to the sheriff's office at the county jail. After Callahan had been issued a ticket for having a switched tag, Deputy Alexander told him that some investigators wished to talk with him. Callahan replied "okay" and Alexander told him "he could have a seat back by the television in the back of the lobby area of the county jail." Although Deputy Alexander testified that Callahan was not free to leave at that time, he also testified that he never told or placed Callahan under arrest, never placed him in custody or in jail, and never told him that he could not leave.
Deputy Alexander candidly admitted that the primary reason Callahan was stopped was because he was a suspect. At trial, Alexander testified, and the State argued, that the purpose of taking Callahan to the sheriff's office was twofold: First, to issue him a ticket for having an improper tag; and second, to turn him over to the investigators of the disappearance and murder of Rebecca Howell. Deputy Alexander remained at the sheriff's office until 7:30 or 8:00 A.M. He testified that during that time "nothing appeared to be wrong with [Callahan] physically," but that he "appeared to be a little nervous."
Deputy Max Kirby arrived at the sheriff's office around 5:45 A.M. and observed that Callahan was watching television. He testified that, approximately thirty minutes after he arrived, he and Deputy Larry Amerson walked over to Callahan and told him they would like to talk with him. Callahan said "Okay" and continued to watch television. Kirby said that it would be a while and Callahan again replied "Okay." As best this Court can determine, Callahan was fingerprinted at 7:15 A.M. At approximately 7:45 A.M., Kirby went to the District Attorney's Office, returning over an hour later. When Kirby returned, Callahan was still watching television. At approximately 9:00 A.M., Deputies Kirby and Amerson served Callahan with a "probation *Page 1296 
tolling order/arrest warrant" issued by Circuit Judge Malcolm E. Street and placed him under arrest pursuant to that order.[1] Deputy Kirby then advised Callahan that he wished to talk with Callahan regarding the Howell case. Thereafter, Callahan gave four statements, two on February 22 and two on February 23. The substance of, and the circumstances surrounding, those statements are as follows:
(1) Beginning around 9:30 A.M. on the morning of February 22, Callahan gave his first statement in the presence of Deputy Kirby and Sergeant Thienes. This statement was transcribed by Kirby and bears Callahan's signature at the bottom of each page. Deputy Kirby testified that, prior to taking his statement, he advised Callahan of his Miranda rights. Callahan stated that he understood these rights and informed Kirby that he had an attorney, but that "he didn't need him right then" and "would let [Kirby] know when he needed him." Kirby wrote down the name, address, and telephone number of his attorney. Callahan then executed a waiver of rights, which was witnessed by both Kirby and Thienes. Deputy Kirby testified that, while he was present, Callahan was neither threatened nor offered any reward or hope of reward in order to induce him to make a statement.
In this statement, Callahan maintained that, on the night Ms. Howell disappeared, he washed clothes at a Jacksonville washateria and then went to the Jacksonville Hospital where his father was visiting his mother. Around 11:00 P.M., he left the hospital with his father and they traveled in separate vehicles to his father's house in Anniston. He remained there for the rest of the night.
(2) Callahan gave a second statement on the afternoon of February 22, beginning around 1:45 P.M. and ending at 3:25 P.M. In his statement, Callahan claimed that he was washing clothes in a Jacksonville washateria on the night of February 3 when he saw Ms. Howell, whom he had met before. They entered into a conversation, during which she stated that she was engaged to be married, and Callahan offered to rent his mobile home to her and her future husband. According to Callahan, Ms. Howell wished to view the mobile home that night. Around midnight, they left the washateria in his truck and drove to the mobile home, which was located just outside Jacksonville in rural Calhoun County. While they were at the mobile home, Callahan's estranged wife (whom he had earlier observed in an automobile outside the laundromat) came in, pointed a gun at Callahan, accused him of cheating on her, and forced him to tape Ms. Howell's hands together with tape from the kitchen cabinet. Callahan then managed to escape out the back door and leave in his truck. Shortly after completing this statement, Callahan changed portions of it to add that he had dated Ms. Howell prior to February 3 and that he and Ms. Howell were having sexual intercourse when his wife arrived at the mobile home.
This statement was given in the presence of Assistant District Attorney Joseph D. Hubbard, Deputy Kirby, Deputy Larry Amerson, and Ms. Diana Hinds, a court reporter, who subsequently transcribed the statement. Hubbard testified that, prior to any questioning, Callahan was advised of hisMiranda rights by Deputy Amerson and executed a written waiver of counsel. Hubbard also stated that no one offered Callahan any reward or hope of reward in return for making a statement, nor did any one threaten Callahan in any manner to induce him to make a statement. Prior to actually giving this statement, — Callahan said, "I know of my rights. I wish to give a statement at this particular time in order to help clear my own personal self."
(3) The third statement was given by Callahan around 10:15 on the morning of February 23. Earlier that morning, at Callahan's request, law enforcement officers had obtained a photograph from Callahan's *Page 1297 
father's house. In his statement, Callahan identified the girl in the photograph as one Malera Fox and asserted that she resembled Ms. Howell. According to Callahan, Mrs. Fox had once expressed interest in him, causing his wife to become jealous. He suggested that his wife mistook Ms. Howell for Mrs. Fox at his mobile home on the night of February 3.
This statement was made in the presence of Assistant District Attorney Hubbard, Deputy Kirby, and Sergeant Thienes. Hubbard taped this statement and it was later transcribed by Ms. Parian Tidwell, a court reporter. Hubbard testified that, prior to any questioning, Deputy Kirby advised Callahan of his Miranda rights and Callahan executed a written waiver of rights. At that point, Hubbard stated that he
 "asked Mr. Callahan or stated to him, 'All right. Jimmy, with these rights in mind, do you wish to talk to us about what we were talking about yesterday?' And the Defendant stated, 'Yes, I'll continue talking because I'm trying to clear myself.' And I stated to the Defendant, 'All right, sir. But you voluntarily are talking to us?' The Defendant stated, quote, 'Right,' unquote. Then I asked, 'Is that correct? Okay. And you understand all of those rights?' And Mr. Callahan stated, 'Yes, I really do.' "
Hubbard also stated that no reward or hope of reward was offered to Callahan nor was Callahan threatened in any manner to obtain this statement.
(4) The most damaging statement was given by Callahan on the afternoon of February 23, beginning around 2:45 P.M. Present during this statement were Mr. Hubbard, Deputy Kirby, Sergeant Thienes, Sergeant Lawton Hall, and Ms. Hinds, the court reporter who later transcribed the statement. The circumstances surrounding the taking of this statement were described by Hubbard. Prior to giving this statement, Callahan was again advised of his constitutional rights by Deputy Kirby and executed a written waiver of counsel. Hubbard testified that the statement that followed was given voluntarily by Callahan and that no one threatened Callahan nor did anyone offer him a reward or hope of reward in return for the statement.
In this statement, Callahan admitted that he forced Ms. Howell to leave the laundromat with him. He took her to his mobile home where he held her prisoner for two days. On the night of February 4, she agreed to have sexual intercourse with him in return for his releasing her and they, in fact, had sexual intercourse. On the night of February 5, he taped her hands together and began to drive her to an area near some houses where he planned to release her. However, near the creek in which her body was later found, she jumped out of the truck and ran toward the creek. Callahan stated that Ms. Howell's boots, panty-hose, and socks were in the back of his truck and that he threw the boots out on his drive back.
Just as Callahan finished giving this statement, Circuit Judge Sam Monk knocked on the door and entered the interrogation room. After advising Callahan of hisMiranda rights, Judge Monk informed Callahan that his father had retained an attorney, Fred Lybrand, to talk with him concerning possible representation, that Lybrand was outside, and that it was up to Callahan whether he would consult with Lybrand. Callahan responded, "If my father sent him down here, I might ought to talk with him briefly. But that would be about all." At that time, everyone except Callahan left the room and attorney Lybrand went into the room to consult with Callahan.
Callahan did not give any other formal statements. However, on February 24, he offered to show law enforcement officers where he had discarded Ms. Howell's boots. He drove around with the officers directing them to certain locations. Although he was unable to locate Ms. Howell's boots on this expedition, Callahan did lead officers to Ms. Howell's purse, which was found behind a woodpile at the home of Callahan's father-in-law, located in Collinsville, Alabama. Callahan also directed the officers to his father's house in Anniston where he retrieved from his camper a knife *Page 1298 
which he said was lying on the dashboard of his truck the night he forced Ms. Howell to leave the laundromat with him. Ms. Howell's boots were subsequently turned over to law enforcement personnel by Callahan's brother-in-law, Paul Henninger, who had found them around February 21 in Callahan's mobile home.
Deputy Kirby testified that the officers had no intention of talking with Callahan after attorney Lybrand's arrival on February 23. However, between 11:00 and 11:30 A.M. on February 24, Callahan sent word to Deputy Kirby through a trusty that he wished to talk to Kirby. Some twenty minutes after receiving this message, Kirby had Callahan brought to him and he orally informed Callahan of his Miranda rights. Callahan stated that he understood these rights and then told Kirby that he could show Kirby where he threw Ms. Howell's boots out of his truck.
Deputy Kirby read and explained to Callahan a waiver of counsel form and a consent form for Callahan to accompany law enforcement officers on a search for Ms. Howell's "boots, socks, and other items of clothing." Callahan stated that he understood these documents and then signed both forms. Sheriff Snead testified that no reward or hope of reward was offered to Callahan nor was Callahan threatened in order to induce him to accompany the officers on this trip.
Callahan took the stand only at the hearing on his motion to suppress. In contradiction of the State's evidence set forth above, Callahan denied that he was served with the probation tolling order, denied that he was ever informed of his constitutional rights at any time, and denied signing any of the waiver of counsel forms. He stated that he asked to call an attorney some twenty to twenty-five times, but that these requests were refused; that Deputy Kirby threatened and physically mistreated him, with some of this taking place in the presence of Joe Hubbard; that "Kirby mentioned a couple of times things go easier on you if you give statements or whatever"; that he was not given food or drink; that he was in poor condition physically due to lack of sleep and the consumption of alcohol and drugs; that he did not voluntarily go on the trip with the officers on February 24. Callahan maintained that he "wasn't voluntarily doing anything." He also asserted that the statements transcribed by Ms. Hinds were incorrect and did not reflect what he actually said. In response to the trial judge's question as to why, when he (the judge) and attorney Lybrand came into the interrogation room, Callahan did not appeal to them for assistance, Callahan replied that he "did make efforts to Mr. Lybrand for help" and "advised him what was going on at that time."
A copy of attorney Lybrand's testimony from the prior trial was introduced by Callahan at the suppression hearing. This testimony merely recounts that Lybrand went to the Calhoun County Jail on the afternoon of February 23 at the request of Callahan's father. He spoke with Sheriff Snead and requested to talk with Callahan, but was not permitted to do so. Lybrand then went to Judge Monk's office and "explained to him that [he] had been contacted by the family and that [he] had told them that [he] would go down to the jail and see if [he] could talk to Mr. Callahan." Lybrand returned to the jail with Judge Monk, who entered the interrogation room, and, shortly thereafter, Lybrand was allowed to talk with Callahan. Around 5:00 that afternoon, Lybrand called the Callahan family to explain that, due to his personal relationship with the family of the victim, he was unable to represent Callahan in this matter. Lybrand conveyed this same information to the District Attorney the next morning. There is nothing in Lybrand's testimony to indicate that Callahan informed him of the alleged mistreatment, abuse, and deprivation that Callahan asserts he received at the hands of law enforcement officers. Lybrand did testify that, when he entered the interrogation room, Callahan "appeared to be tired and somewhat emotional."
In rebuttal, Deputy Kirby stated unequivocally that he did not threaten or physically abuse Callahan in any way; that Callahan "was very eager to cooperate"; and that this cooperation was not the result *Page 1299 
of any threats or promises. Assistant District Attorney Hubbard also testified in rebuttal. He stated that Callahan never requested to use the telephone; that he observed Callahan drinking several soft drinks and asked Callahan several times if he wanted anything to eat or drink; that Callahan did not at any time appear to be sedated or suffering from any emotional or mental distress; that he had read the statements transcribed by Ms. Hinds and they were "exactly what Mr. Callahan said on those occasions"; that Deputy Kirby never threatened or intimidated Callahan in his presence; and that he saw Callahan sign three of the waivers introduced. Hubbard had previously testified that, during the three statements made in his presence, Callahan never requested to see an attorney; did not appear to be under any stress whatsoever, except that he did become "emotional" and "whimper[ed]" at times during the last statement, which was the only statement in which he admitted abducting Ms. Howell; was allowed to drink and eat; and, overall, was eager to cooperate.
 FIFTH AMENDMENT CHALLENGE
An extrajudicial statement is presumed to be involuntary,Royal v. State, 447 So.2d 834 (Ala.Cr.App. 1983); Cole v.State, 443 So.2d 1386 (Ala.Cr.App. 1983), and is inadmissible unless the State presents sufficient evidence to overcome this presumption. Ex parte Shula, 465 So.2d 452 (Ala. 1985); Greenv. State, 439 So.2d 816 (Ala.Cr.App. 1983). "[T]he duty rests in the first instance on the trial court to determine whether a confession is voluntary." Wright v. State, 340 So.2d 69, 70
(Ala.Cr.App.), reversed on other grounds, principle approved,340 So.2d 74, 76 (Ala. 1976); Ex parte Shula, 465 So.2d at 45354. For a statement to be admissible, the trial court must determine (1) that law enforcement officers complied with theMiranda requirements and (2) that the statement was voluntarily given. United States v. Sims, 719 F.2d 375 (11th Cir. 1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703
(1984); see Boggan v. State, 455 So.2d 228 (Ala.Cr.App. 1984). The trial court "is to make [t]his determination upon a consideration of the 'totality of the circumstances,' Blackburnv. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960)."Myers v. State, 431 So.2d 1342, 1345 (Ala.Cr.App. 1982), writ quashed, 431 So.2d 1346 (Ala. 1983).
The determination of the admissibility of an incriminating statement or confession is to be made by the trial court based upon evidence heard outside the presence of the jury.Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908
(1964). When this evidence is in conflict, a question of fact is presented for the trial court. See Ex parte Johnson,522 So.2d 234 (Ala. 1988); Sales v. State, 432 So.2d 560
(Ala.Cr.App. 1983). In finding a statement to be voluntary, the trial court need only to be convinced from a preponderance of the evidence. Seawright v. State, 479 So.2d 1362 (Ala.Cr.App. 1985); Chambers v. State, 455 So.2d 1008 (Ala.Cr.App. 1984). "Where the trial judge finds on conflicting evidence that the [statement] was voluntarily made, its finding will not be disturbed on appeal unless found to be manifestly contrary to the great weight of the evidence." Malone v. State,452 So.2d 1386, 1389 (Ala.Cr.App. 1984). See also Ex parte Singleton,465 So.2d 443 (Ala. 1985).
In the instant case, the trial judge conducted a pretrial hearing on Callahan's motion to suppress and obtained additional evidence concerning the statements at the trial during voir dire examinations outside the presence of the jury. Although Callahan's first conviction was reversed because the State failed to prove that the statements made by Callahan on February 22 and 23 were free and voluntary, Callahan, 471 So.2d at 467, 470-71, the record in this case clearly reveals that the Miranda predicate was properly laid for each of the statements made by Callahan.
There was conflicting evidence concerning the voluntariness of the statements, with Callahan asserting that the statements were the product of mistreatment, threats, and offers of leniency and the State's witnesses unequivocally stating that Callahan was not mistreated and that *Page 1300 
no threats of any kind were made to him, nor any reward or hope of reward offered him. Faced with this conflicting evidence, the trial judge chose to believe the State's witnesses. That determination of voluntariness is supported by a preponderance of the evidence.
There was also conflicting evidence concerning Callahan's physical condition. Although the accused's intoxication is one factor which must be considered in determining whether the confession was voluntary, "intoxication when he confessed does not render the confession inadmissible unless his reason was so far dethroned that he was unable to understand the effect of what he was saying or to give a true account of his actions with respect to the alleged crime." C. Gamble, McElroy'sAlabama Evidence § 200.14(2) (3rd ed. 1977). The intoxicated condition of an accused when he makes a confession, unless it goes to the extent of mania, does not affect the admissibility in evidence of the confession, but may affect its weight and credibility. Smith v. State, 25 Ala. App. 297, 298, 145 So. 504
(1933); Eskridge v. State, 25 Ala. 30, 33 (1854). The evidence does not support a finding that Callahan was so impaired. While both Mr. Hubbard (a prosecution witness) and Mr. Lybrand (a defense witness) described Callahan as "emotional" during or after the fourth statement, this does not vitiate the admissibility of that statement. "Mere emotionalism and confusion do not dictate a finding of mental incompetency or insanity" so as to render a statement inadmissible. Sullivan v.Alabama, 666 F.2d 478, 483 (11th Cir. 1982). See also UnitedStates v. Rouco, 765 F.2d 983, 993 (11th Cir. 1985), cert. denied, Rouco v. United States, 475 U.S. 1124, 106 S.Ct. 1646,90 L.Ed.2d 190 (1986) ("Some amount of nervousness and depression following one's arrest for murder, where the evidence of guilt is overwhelming, is normal and not grounds for holding an otherwise valid confession inadmissible.").
For the reasons stated above, Callahan's Fifth Amendment challenge to the admission of these statements must fail.
 FOURTH AMENDMENT ISSUE
Although Callahan has not raised on appeal the issue of the legality of his arrest with regard to the admissibility of his statements, even though objection was presented at trial, this Court feels compelled to address that issue due to the fact that Callahan has been sentenced to death. As this Court noted in Cox v. State, 489 So.2d 612, 618 (Ala.Cr.App. 1985), "[i]n order to be admissible into evidence, a [statement] must satisfy the requirements of both the Fourth and Fifth Amendments to the Constitution of the United States. Dunaway v.New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979);Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694
(1966)." (Emphasis added.) Unless probable cause exists or the suspect voluntarily consents or prior judicial authorization has been obtained, the Fourth Amendment prohibits the transportation of a suspect to the police station where he is then detained for investigatory purposes, such as interrogation. Hayes v. Florida, 470 U.S. 811, 105 S.Ct. 1643,84 L.Ed.2d 705 (1985); Cox v. State, supra.
There has been no suggestion that Callahan was arrested at 5:00 A.M. pursuant to a valid arrest warrant or that he voluntarily accompanied Deputy Alexander and Sergeant Thienes to the sheriff's office. We must therefore determine whether probable cause existed to justify Callahan's initial arrest.
The initial stop of Callahan was proper. Callahan was driving a motor vehicle with an improper tag. This is a misdemeanor offense in violation of Ala. Code 1975, § 32-6-131. Therefore, Deputy Alexander had the right to arrest Callahan and take him into custody. "An arresting officer has authority to arrest a violator for a traffic offense and, upon doing so, is under a statutory duty to release the violator only if the violator signs "a bond approved by the arresting officer; agreeing to appear in court." Vickers v. State, 547 So.2d 1191 (Ala.Cr.App. 1989).
However, in general, traditional "custodial arrests" are not permitted for misdemeanor *Page 1301 
traffic offenses. Ala. Code 1975, § 32-1-4. See Hays v. City ofJacksonville, 518 So.2d 892 (Ala.Cr.App. 1987). "The clear import of this section is that the police have no authority to take a motorist into custody and then require him to go to the local station-house when that motorist has committed a misdemeanor traffic violation but is willing to sign the summons to court." Morton v. State, 452 So.2d 1361, 1364
(Ala.Cr.App. 1984). In Daniels v. State, 416 So.2d 760, 764-65
(Ala.Cr.App. 1982), this Court held that it was reasonable for a police officer to request a motorist to get out of his automobile so that he could be taken to the police station and charged with driving with a suspended license tag and driving without a license where the police officer did not have his "ticket book" with him. As the motorist opened the car door, the officer observed a pistol and, when he reached for the pistol, the officer discovered a bottle which was subsequently determined to contain a controlled substance. In Daniels, we noted that "[t]here is nothing to indicate that this [taking to the police station] was done as a ruse or subterfuge in order to justify the removal of the defendant from the automobile and excuse a subsequent search." 416 So.2d at 765.
As stated, the legality of Callahan's arrest has not been raised on this appeal. This issue was not addressed on Callahan's first appeal. The issue was not raised at the pretrial motion to suppress. Objection was first made at trial when the prosecution attempted to introduce Callahan's statements into evidence. At that time, defense counsel maintained that Callahan's arrest for the switched tag was a "subterfuge" and was merely a "pretext in order to turn him over for questioning in connection with this murder, and that he became a suspect subsequent to that, a good time subsequent to that as a result of interrogation."
The trial judge found that the initial arrest was not a pretext:
 "I've never had any feeling whatsoever that a pretense stop was involved at all. I mean by the officer's very testimony he staked out that particular vehicle and house from midnight until 5:00 A.M. You don't make pretense stops if you stake out a place. Clearly he was watching that particular vehicle.
 "We can criticize the administrative procedure adopted by the Sheriffs Department in not allowing their vehicles to have citation books and maintain a citation book at the jail. But again that doesn't reduce his initial stop or detention to illegal detention.
 "The question is at what point did he — was he — at what point was he legally placed under arrest, and prior to that time was his detention illegal?
"* * * *
 "The testimony I have heard so far, of course, I don't — I feel like he was under a legal detention but not perhaps one that rose to the dignity of an arrest at that point, or to the height of an arrest. Dignity is the wrong word. To the degree of an arrest. Of course, detention and arrest are matters of degree and not necessarily kind.
 "They have a right to detain him to issue the citation. There's no question about that. Officers also have the right to arrest for the commission of a felony based on probable cause. I feel like probable cause has been established.
"* * * *
 "I find that at the time Deputy Alexander relinquished possession, custody, responsibility, whatever word you want to use, possession or custody of or responsibility for the Defendant, that at that point in time the Defendant was — had not been illegally detained.
 "Now, the question, again, is from that time to the time he was placed under some formal charge was his detention illegal. Again, I think the State has some evidence that it's going to produce, I assume, on that to fill in that time — time gap. We've already heard some of it in the motion to suppress hearing. But again, the — I feel that there was sufficient probable cause at that point to detain the Defendant for questioning on this particular crime, and his detention was not illegal." *Page 1302 
In the trial judge's written order imposing the death sentence, he found "that the officers making the initial traffic stop of the Defendant had just, legal cause to do so due to his operation of a motor vehicle on a public roadway with an improper tag, as well as for questioning in the disappearance and death of Rebecca Suzanne Howell."
It appears that Callahan was never arrested for the murder of Ms. Howell until after his indictment on April 5, 1982. Since Callahan was being held on a warrant for probation violation, there was no need for any other formal charge.
Our review convinces us that there existed probable cause to arrest Callahan for Ms. Howell's murder at the time he was stopped for the improper license tag. Before he stopped Callahan, Deputy Alexander knew that the license tag on Callahan's truck was incorrect (switched), he was aware of the facts and circumstances which had been uncovered in the investigation concerning the disappearance and murder of Ms. Howell, he knew that the license tag number on Callahan's truck had been observed near the washeteria at which Ms. Howell disappeared, and he knew that Callahan was a suspect. Alexander indicated that he was "aware of all of the information that had been gathered by the Sheriff's Department, whatever it was up to that point."
Deputy Alexander candidly admitted that the primary reason Callahan was stopped was because he was a suspect. After the ticket had been issued, Callahan was "turned over" to other deputies who were investigating the murder of Ms. Howell.
In Issue II of this opinion, we determine that there was sufficient information contained in the affidavit for the search warrant to establish probable cause to search Callahan's truck. All of the facts contained in the affidavit (except the fact that Callahan appeared to hide something behind the seat of the truck when stopped) were known to the investigating officers prior to Callahan's initial arrest. "Whether one is concerned with probable cause to arrest or probable cause to search, the amount of evidence required is generally the same."Nikolic v. State, 384 So.2d 1141, 1148 (Ala.Cr.App. 1979), cert. stricken, Ex parte Nikolic, 384 So.2d 1151 (Ala. 1980). On this basis, we find that Deputy Alexander had probable cause to arrest Callahan for the abduction and murder of Ms. Howell. Although Alexander did not testify to the particulars of the information he possessed (other than what we have set out above), the information contained in the affidavit for the search warrant can be imputed to him. "It is a 'well-recognized principle that, where a group of officers is conducting an operation and there is at least minimal communication among them, [the appropriate course is to] look to the collective knowledge of the officers in determining probable cause.'" Exparte Boyd, 542 So.2d 1276 (Ala. 1989). " '[P]robable cause may emanate from the collective knowledge of the police, though the officer who performs the act of . . . searching [or arresting] may be far less informed.' " Boyd, supra; Robinson v. State,361 So.2d 379, 382 (Ala.Cr.App.), cert. denied, 361 So.2d 383
(Ala. 1978).
We find that the initial stop, arrest, and detention of Callahan were valid. Despite the fact that Callahan was initially arrested for a traffic offense, the fact remains that at that time there existed probable cause for his arrest for the murder of Ms. Howell.
" 'When an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest.' United States v. Saunders,476 F.2d 5, 7 (5th Cir. 1973). See generally 2 W. LaFave, Searchand Seizure § 5.1(e) at 416 n. 168 (2d ed. 1987)." Powell v.State, 548 So.2d 590 (Ala.Cr.App. 1988) (arrest for concealing identity under an unconstitutional city ordinance immaterial where there was probable cause to arrest for capital murder). "[T]he validity of the arrest should be judged by whether the arresting officers actually had probable cause for the arrest, rather than by whether *Page 1303 
the officers gave the arrested person the right reason for the arrest." United States v. Lester, 647 F.2d 869, 873 (8th Cir. 1981). See also United States v. Rambo, 789 F.2d 1289, 1293-95
(8th Cir. 1986); Ricehill v. Brewer, 338 F. Supp. 1311 (S.D. Iowa 1971), affirmed, 459 F.2d 537 (8th Cir. 1972); Reese v.State, 145 Ga. App. 453, 243 S.E.2d 650, 652 (1978); State v.Wilkens, 364 So.2d 934, 937 (La. 1978). In each of these cases, the accused was arrested for a stated offense which was not supported by probable cause, but the arrests were upheld because probable cause to arrest for another offense actually existed.
The arrest of Callahan for the improper tag was not a pretext in the sense of it being a sham or a fraud because it was supported by probable cause. Cf.Mills v. Wainwright,415 F.2d 787, 790 (5th Cir. 1969). Because there was probable cause to arrest Callahan for Ms. Howell's abduction and murder, we find that any impropriety in his 5:00 A.M. arrest did not render Callahan's statements inadmissible under the Fourth Amendment.
 SIXTH AMENDMENT CHALLENGE
There is no basis for a Sixth Amendment challenge to the admission of Callahan's statements. The statements were made before the initiation of formal charges[2] and Callahan's Sixth Amendment right to counsel had not yet attached. Moran v.Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986);McCall v. State, 501 So.2d 496 (Ala.Cr.App. 1986). There was no violation of the Fifth Amendment, the Sixth Amendment, or the constitution of this state due to the failure of law enforcement officials, after Callahan had been given the properMiranda warnings, to inform him "of the presence of an attorney who had been sent at the request of a third party." Ex parteNeelley, 494 So.2d 697, 699 (Ala. 1986), cert. denied,480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987) (applying Moran v.Burbine, supra, with regard to the Fifth and Sixth Amendments). (Emphasis in original.)
For all of these reasons, we find that Callahan's statements were properly admitted into evidence.
 II
Callahan argues that the trial court erroneously admitted into evidence a pillow found in his truck. He argues that the pillow was inadmissible because (1) it was found during an illegal search, and (2) it was not "relevant."
 A
When Callahan was stopped on the morning of February 22, the detaining officers observed him place something behind the seat of his truck. That same morning, law enforcement officials sought and obtained a search warrant for Callahan's truck. A pillow was found behind the seat of the truck during the search conducted pursuant to this warrant. Callahan asserts that the affidavit upon which the search warrant was based "was a conclusion by the affiant," rendering the search warrant invalid.
The affidavit specified "one pair beige suede western style boots and one brown clutch style purse" as the "Property To Be Searched For." The basis for the affiant's belief that these items were in Callahan's truck appears as follows:
 "My name is Max Kirby. I am a deputy with the Calhoun County Sheriff's Office. On or during the night of 2/3/82 Rebecca S. Howell was abducted from Norge Village Washateria in Jacksonville, Alabama. On 2/17/82 her body was found. Missing were her beige suede western style boots and a brown clutch style purse. In my investigation I have received information from a citizen that on the night of 2/3/82 he saw a 'new' 1980 or 1981 green Ford truck *Page 1304 
bearing Alabama tag # RNF 467 with a white male inside it sitting at a washateria approximately 4 blocks from the Norge Village and that this white male appeared to be watching a lone female using a telephone there. This citizen became suspicious and wrote down the tag number on this truck. I have checked the registration on this tag and it is registered to Jimmy Callahan, Rt. 1, Box 462, Jacksonville, Alabama. I have checked our files and determined that Jimmy Callahan is presently on bond awaiting preliminary hearing on a sodomy charge. I have also determined that the above tag is supposed to be on a 1976 Ford Courrier registered to Jimmy Callahan. After receiving this information, I located the residence of Jimmy Callahan's father at 3029 Walnut Avenue, Anniston, Alabama. At approximately 9:30 P.M. on 2/21/82 a green Ford truck similar to the one my citizen informant described to me showed up at this residence. The tag (RNF 467) written down by this informant was on the truck. A deputy inquired of Jimmy Callahan's father about the whereabouts of Jimmy Callahan and was told he was out of town for 2 more days. A stakeout was set up to watch this truck. Further, at approximately 10:15 P.M., my citizen informant was driven by 3029 Walnut Avenue, Anniston, Alabama, and he positively identified this truck as being the one he saw on 2/3/82. On this morning (2/22/82) at approximately 5:00 A.M., Jimmy Callahan came out of his father's house and got in his truck and commenced driving north on Walnut Avenue. The officers on the stakeout detail stopped Jimmy Callahan's vehicle, he got out and appeared to put something behind the front seat, and then locked the door and closed it. Jimmy Callahan locked the truck and told the officers if they needed in the truck they would have to call someone to get a key. I have examined this truck and found it matches the full description given me by my informant. It has evidence on it that shows certain equipment mounted there and described to me has been removed. I have also received information from another citizen informant that at approximately 12:06 A.M. on 2/4/82 a green truck described just like Jimmy Callahan's was seen parked at Norge Village in Jacksonville, Alabama, where Rebecca S. Howell was abducted. Based upon all of the foregoing information, I believe . . . the truck of Jimmy Callahan or his residence at Rt. 1, Box 462, Jacksonville, Alabama, to contain the stolen personal property of Rebecca S. Howell as described above."
"For a search warrant to be sufficient and satisfy the constitutional requirement of probable cause, the affidavit upon which it is based must state specific facts or circumstances which support a finding of probable cause."Carter v. State, 405 So.2d 957, 959 (Ala.Cr.App.), cert. denied, 405 So.2d 962 (Ala. 1981). "An affidavit which contains a mere conclusory affirmation of suspicion and belief, without statements of adequate support, is an inadequate basis for a magistrate's finding of probable cause. Murry [v. State,48 Ala. App. 89, 261 So.2d 922 (1972)]." Waters v. State,357 So.2d 368, 371 (Ala.Cr.App.), cert. denied, 357 So.2d 373 (Ala. 1978). Although the instant affidavit contains some conclusory statements, it is far from being "merely conclusory." It contains "numerous factual details important to a determination of probable cause," including: (1) the fact that a felony had been committed; (2) the facts that a truck was seen in close proximity to the scene of the abduction by one citizen informant and at the scene of the abduction by another citizen informant; (3) the fact that this truck had been traced to Callahan through the tag number as supplied by one of the citizen informants; (4) the fact that the citizen informant who supplied the tag number had identified Callahan's truck as the truck he saw on the night of the abduction; and (5) the fact that, when stopped by police officers that morning, Callahan had appeared to hide something behind the seat of the truck.
"Probable cause deals with probabilities, not legal technicalities. It is grounded upon those practical, factual considerations of everyday life upon which reasonable and *Page 1305 
prudent men act, Brinegar v. United States, 338 U.S. 160,69 S.Ct. 1302, 93 L.Ed. 1879 (1948)." Carter v. State, 405 So.2d at 959. "Probable cause does not require an officer to compile an airtight case against a suspect. Rather, it deals with the probable consequences of all the legitimate facts considered as a whole." Williams v. State, 440 So.2d 1139, 1145 (Ala.Cr.App. 1983). Applying these principles, we find that sufficient facts were contained in the affidavit from which the issuing magistrate could conclude that a felony had been committed and that evidence related to this felony could be found in Callahan's truck. We note that on Callahan's first appeal, we found that this same affidavit was "more than sufficient to support the warrant issued." Callahan v. State, 471 So.2d 447,454 (Ala.Cr.App. 1983), reversed on other grounds, Ex parteCallahan, 471 So.2d 463 (Ala. 1985).
 B
With regard to relevancy of evidence, this Court stated inMitchell v. State, 473 So.2d 591, 594 (Ala.Cr.App. 1985):
 "Evidence is relevant if it has 'any tendency to throw light upon the matter in issue, even though such light may be weak and falls short of demonstration.' McCain v. State, 46 Ala. App. 627, 247 So.2d 383 (1971); Austin v. State, 434 So.2d 289 (Ala.Crim.App. 1983). 'Any fact which has causal connection or logical relation to another fact, either more or less probable, is competent or relevant.' Hurst v. State, 397 So.2d 203
(Ala.Crim.App.), cert. denied, 397 So.2d 208 (Ala. 1981); Waters v. State, 357 So.2d 368
(Ala.Crim.App.), cert. denied, 357 So.2d 373 (Ala. 1978). Further, evidence is relevant if it has any
probative value, however slight, upon a matter at issue in the case. C. Gamble, McElroy's Alabama Evidence, § 21.01 (3d ed. 1977)." (Emphasis added.)
Dr. Joseph Embry, the pathologist who performed the autopsy, testified that, in his opinion, Ms. Howell's death was due to "obstruction of the airway resulting in asphyxia." He stated that this would be consistent with smothering by a pillow, but also acknowledged that it would be consistent with smothering by a towel or hands. The pillow was material because the cause of the victim's death was an issue in this case. The pillow found in Callahan's truck was relevant because it demonstrated that Callahan had, at ready access, an item, aside from his hands, with which Ms. Howell could have been smothered. Therefore, the pillow was properly admitted into evidence.
 III
A photograph of the victim's taped hands was properly admitted into evidence. The photograph was taken as the victim's body was being removed from the Tallaseehatchee Creek on February 17, some two weeks after she was abducted, and it showed her forearms, which were covered with algae, and her taped hands. Callahan asserts that, due to the condition of the body, the photograph had no probative value and served only to prejudice and inflame the jury.
"As a general rule, photographs are admissible in evidence if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge." Magwood v. State,494 So.2d 124, 141 (Ala.Cr.App. 1985), affirmed, Ex parte Magwood,494 So.2d 154 (Ala.), cert. denied, Magwood v. Alabama,479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).
Dr. Joseph Embry testified that the victim's hands were "very tightly bound by" four pieces of three-inch-wide white tape. Also, Callahan admitted in two of his statements that he had taped Ms. Howell's hands together. The photograph in question illustrated and corroborated both the testimony of Embry and the statements made by Callahan. We have reviewed this photograph and, while it is not pleasant, it is not gruesome or ghastly. In any event, "[t]he fact that a photograph is gruesome and ghastly is no reason for excluding it, if *Page 1306 
relevant, even if the photograph may tend to inflame the jury."Walker v. State, 416 So.2d 1083, 1090 (Ala.Cr.App. 1982). See also Magwood, 494 So.2d at 141, and cases cited therein. Having demonstrated the relevancy of this photograph, we find no error in its admission. See Callahan, 471 So.2d at 456. Cf. Gore v.State, 475 So.2d 1205 (Fla. 1985), cert. denied, Gore v.Florida, 475 U.S. 1031, 106 S.Ct. 1240, 89 L.Ed.2d 348 (1986) (holding that a photograph of the hands of the murder victim tied behind her back was properly admitted because it showed the considerable pain inflicted upon the victim by the defendant).
 IV
Callahan's motion for change of venue was properly denied. We note, initially, that the motion was procedurally defective in that it was not sworn to by Callahan as required by Ala. Code 1975, § 15-2-20(a). See Sparks v. State, 450 So.2d 188, 190
(Ala.Cr.App. 1984). Moreover, Callahan failed to introduce any evidence to support the allegations of prejudicial pretrial publicity contained in this motion.
A defendant who moves for a change of venue on the basis of prejudicial publicity is entitled to such a change in two situations:
 "The first is when the defendant can show that prejudicial pre-trial publicity 'has so saturated the community as to have a probable impact on the prospective jurors' and thus renders the trial setting 'inherently suspect.' Mc Williams v. United States, 394 F.2d 41 [(8th Cir. 1968)]; Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). In this situation, a 'pattern of deep and bitter prejudice' must exist in the community. Irvin v. Dowd [366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)].
 "The second situation occurs when the defendant shows 'a connection between the publicity generated by the news articles, radio and television broadcasts and the existence of actual jury prejudice.' McWilliams v. United States, supra." Nelson v. State, 440 So.2d 1130, 1131-32
(Ala.Cr.App. 1983) (emphasis added).
In order to be entitled to a change of venue, "thedefendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333,86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Franklin v. State,424 So.2d 1353 (Ala.Crim.App. 1982)." Ex parte Grayson, 479 So.2d 76,80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189,88 L.Ed.2d 157 (1985) (emphasis added). "When the defendant applies for a change of venue, it is his burden to show to the reasonable satisfaction of the court that an impartial trial and an unbiased verdict cannot be reasonably expected in [the county in which the indictment was found]." Sprinkle v. State,368 So.2d 554, 558 (Ala.Cr.App. 1978), writ quashed,368 So.2d 565 (Ala. 1979) (emphasis added). See also Peoples v. State,510 So.2d 554, 563 (Ala.Cr.App. 1986), affirmed, 510 So.2d 574
(Ala.), cert. denied, 484 U.S. 933, 108 S.Ct. 307,98 L.Ed.2d 266 (1987).
A hearing was held on Callahan's motion prior to trial. No evidence whatsoever was introduced by Callahan at that hearing. Defense counsel simply argued that Callahan could not receive a fair trial in Calhoun County due to pretrial publicity and the fact that this was a retrial. Having produced no evidence, Callahan failed to demonstrate any prejudice, or even that pretrial publicity actually existed, and the trial court properly denied his motion on that ground. Carroll v. State,440 So.2d 343 (Ala.Cr.App. 1983), cert. denied, 465 U.S. 1032,104 S.Ct. 1299, 79 L.Ed.2d 698 (1984).
Moreover, the trial court stated at the pretrial conference:
 "The motion for change of venue has been ruled on, of course, subject to review should any additional argument, evidence be presented to the Court; and specifically, that will again be reviewable by the Court upon completion of the jury voir dire. So, if you wish to reassert that motion at any time, especially after voir dire, and we see what kind of jury panel we have that week, please do so."
(Emphasis added.) *Page 1307 
Although there was no renewal of the motion for a change of venue following the voir dire of the jury panel, Callahan now argues that proof of actual prejudice is supplied by the fact that "10 of the prospective jurors actually stated to the Court their impressions and opinions were that [Callahan] is guilty as charged." (Appellant's brief, p. 13.) This "proof," however, does not entitle Callahan to a change of venue.
It appears from the record that, upon conclusion of the voir dire of the jury venire (which included individual examination of each potential juror), Callahan challenged for cause twelve of the eighty-eight members of the jury venire. The challenges were based upon these venire members' belief that he was guilty and were sustained by the trial court. In Murphy v. Florida,421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), twenty of seventy-eight members of the jury venire (approximately 25.6%) held opinions of guilt and were therefore challenged and disqualified. In holding that the defendant was not denied a fair trial, the United States Supreme Court observed:
 "This may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." Murphy, 421 U.S. at 803, 95 S.Ct. at 2038.
We find the same to be true in this case where an even smaller number and percentage (approximately 13.6%) of the venire held an opinion of guilt.
As to Callahan's assertion that the publicity surrounding his first trial prevented fairness in this trial, we again note that no evidence was offered to support this claim. In addition, we take judicial notice that Callahan's first trial was in June of 1982. The second trial took place over five years later, in November of 1987. "That time soothes and erases is a perfectly natural phenomenon, familiar to all." Patton v.Yount, 467 U.S. 1025, 1034, 104 S.Ct. 2885, 2890,81 L.Ed.2d 847, 856 (1984).
" 'Absent a showing of abuse of discretion, the ruling of the trial court on a motion for change of venue will not be disturbed. Speigner v. State, 367 So.2d 590 (Ala.Cr.App. 1978), cert. denied, 367 So.2d 597 (Ala. 1979).' " Ex parte Kennedy,472 So.2d 1106, 1112 (Ala.), cert. denied, 474 U.S. 975,106 S.Ct. 340, 88 L.Ed.2d 325 (1985) (quoting Ex parte Magwood,426 So.2d 929 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097,77 L.Ed.2d 1355 (1983)). There has clearly been no abuse of discretion in the present case.
 V
As set forth in Issue I above, Judge Monk, the trial judge in this case, assisted an attorney in gaining access to Callahan on the afternoon of February 23, when Callahan was making his fourth statement. Callahan contends that Judge Monk, by virtue of this assistance, became a material witness with regard to the voluntariness of his statement and should have recused himself as requested by Callahan in a motion filed prior to trial. See Callahan, 471 So.2d at 453.
Canon 3.C.(1), Ala. Canons of Judicial Ethics, requires the recusal of a judge where the judge's "impartiality might reasonably be questioned." See also Matter of Sheffield,465 So.2d 350 (Ala. 1984). Situations which might give rise to such questioning include cases where the trial judge knows he is likely to be a material witness, Canon 3.C.(1)(d)(iii); see also, Reeves v. State, 260 Ala. 66, 68 So.2d 14 (1953), reversed on other grounds, 348 U.S. 891, 75 S.Ct. 214,99 L.Ed. 700 (1954); Malone v. State, 46 Ala. App. 363, 242 So.2d 409, cert. denied, 286 Ala. 736, 242 So.2d 410 (1970), or where he has personal knowledge of disputed evidentiary facts. Canon 3.C.(1)(a).
In construing a Florida statute providing for the disqualification of a trial judge based on, among other grounds, the fact that the judge is a material witness, the Florida Supreme Court held that a "material witness" is "a witness who gives testimony going to some fact affecting the merits of the cause and about which no other *Page 1308 witness might testify." Wingate v. Mach, 117 Fla. 104,157 So. 421, 422 (1934) (emphasis added). From Wingate, it follows that where the trial judge is not a material witness under this definition, there is no error in the trial court's failure to recuse. Courts in other jurisdictions have adopted this view.Bresnahan v. Luby, 160 Colo. 455, 418 P.2d 171, 173 (1966) ("Where the evidence concerning the transactions in issue may be obtained from witnesses other than the trial judge, then the trial judge is not such a material witness as to require a disqualification.") (citing Wingate v. Mach, supra); Brown v.Bahl, 111 Pa. Super. 598, 170 A. 346, 348 (1934) ("[W]here other witnesses were available [to testify] as to the facts that [the trial judge] observed, there is no ethical or legal reason to disqualify [the judge] simply because of his knowledge."). See also Mosley v. State, 145 Ga. App. 651, 244 S.E.2d 610 (1978) (where trial judge transported juror to hospital, the juror was available to testify as to the incident and the trial judge was not a necessary witness); State v. O'Neal, 501 So.2d 920
(La.App.), cert. denied, 505 So.2d 1139 (La. 1987) (where trial judge received a letter from a co-defendant which the co-defendant, while testifying as a defense witness, admitted writing, the trial judge did not become a material witness). Cf. Coleman v. State, __________ Mont. __________, 633 P.2d 624
(1981), cert. denied, 455 U.S. 983, 102 S.Ct. 1492,71 L.Ed.2d 693 (1982) (where the defendant in a post-conviction proceeding failed to demonstrate that the trial judge was the source of evidence otherwise unobtainable, the judge was not required to recuse himself).
We are convinced that the courts which decided Wingate v.Mach, supra, and the other cases cited above are correct in holding that the trial judge is not a material witness where there are other witnesses who are able to testify concerning the same matter. This conclusion is supported by the Alabama Court of Civil Appeals' opinion in Blackburn v. Tompkins,46 Ala. App. 571, 246 So.2d 459 (1971). There, the appellant asserted that the trial judge erred in not recusing himself after stating at the beginning of the trial that he might possibly be a witness. The Court of Civil Appeals noted that any testimony the trial judge might have given would have added nothing to the appellant's case, "for there were several witnesses who gave testimony along the same lines as that which would have been elicited from the trial judge had he testified. So, the trial judge's testimony would have been purely cumulative." 46 Ala. App. at 577, 246 So.2d at 465. The Court of Civil Appeals did not address the question of whether the trial court erred, merely holding that "any error that might have been committed was harmless error." Id. We now answer this question and hold that there is no error in the trial judge's failure to disqualify himself in such a situation.
In the present case, Assistant District Attorney Hubbard, who was present when Judge Monk entered the interrogation room, testified at the suppression hearing regarding Judge Monk's limited involvement in this matter. Callahan also testified briefly as to Judge Monk's role. In addition, the prior testimony of Mr. Lybrand, the attorney who sought the judge's intervention, was introduced. Consequently, Judge Monk was not a material witness under the cases set forth above and did not err in refusing to disqualify himself for that reason.
"Where the judge is the trier of fact [such as in the determination of the voluntariness of a statement], he must be most scrupulous both to avoid losing his impartiality and to maintain his unfamiliarity with disputed matters which may come before him and with extraneous matters which should not be known by him. . . . [Whether] a judge's other pretrial contact with a matter may require his disqualification will depend on the circumstances of a given case." Furtado v. Furtado,380 Mass. 137, 402 N.E.2d 1024, 1036 (1980). Cf. Wallace v.Wallace, 352 So.2d 1376, 1379 (Ala.Civ.App. 1977) (where a party alleges that a judge is impartial, recusal is required only when the "totality of the facts" show that such is necessary). *Page 1309 
On two separate occasions prior to trial, once at a motion hearing and once at the pretrial conference, Judge Monk described on the record his actions on the afternoon of February 23. (His involvement is recounted in Issue I above.) At the pretrial conference, Judge Monk stated:
 "The entire transaction was judicial in nature. It was in the discharge of my public duty and my duty as a Circuit Judge. I observed nothing factual as far as the taking of the statement. I heard no portions of the statement other than the — a portion of a sentence or so that had no meaning. There's nothing I could testify to that I know of. The events up until the time I knocked on that door are events that could be clearly testified to by Mr. Lybrand. After the time I knocked on that door they are a matter of court — or a matter of record having been, I assumed, . . . transcribed by Mrs. Hinds."
A similar statement appears in the record of the motion hearing at which the motion for recusal was discussed. More importantly, the entire conversation during the judge's presence in the interrogation room was, in fact, recorded and later transcribed by the court reporter as part of the statement. The entire statement, including the judge's remarks, was read into the record at the trial by prosecutor Hubbard.
It appears that Judge Monk was present in the interrogation room for no more than a few moments. The transcript reflects that, while Judge Monk was present, no questions were put to Callahan regarding Ms. Howell's death, no threats were made to Callahan, nor any rewards offered him. In fact, the only conversation after Judge Monk interrupted was that between Judge Monk and Callahan, as described in Issue I above.
This is not a situation in which the trial judge conducted an independent investigation, became the "fact gatherer as well as a fact finder, and thereby subject[ed] a defendant to an impossible burden," which would necessitate a recusal.State v. Stewart, 175 Mont. 286, 573 P.2d 1138, 1148 (1977). Nor is it a situation in which the judge acquired "knowledge dehors the record of the truth or falsity of a matter" and later was required to make a credibility determination with regard to conflicting testimony presented on the matter. People v. Pifer,80 Ill. App.3d 24, 35 Ill.Dec. 476, 399 N.E.2d 310, 312 (1979). The conflicting testimony given with regard to Callahan's statements did not concern any events occurring while Judge Monk was in the interrogation room. In this case, the trial judge considered his prior involvement and "state[d] on the record why his impartiality could not reasonably be called into question." Commonwealth v. Schwartz, 267 Pa. Super. 170,406 A.2d 573, 574 (1979). The "totality of the facts" did not require Judge Monk's recusal. See Matter of Sheffield, Wallacev. Wallace, supra.
 VI
Callahan asserts that the indictment against him should have been quashed because he was illegally arrested and his vehicle was illegally searched. Having determined in Issues I and II above that both the arrest and search were legal, we conclude that this contention is without merit.
 VII
As this is a case in which the death penalty has been imposed, this Court is required by § 13A-5-53(a), Ala. Code (1975), to search the record for any error adversely affecting the substantial rights of the defendant. We have thoroughly reviewed the entire record and have found no error.
Section 13A-5-53(a) also requires this Court to determine "whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence." The trial court found the existence of three aggravating circumstances: (1) "the Capital Offense was committed by a person under sentence of imprisonment," § 13A-5-49(1); (2) the defendant "had been previously convicted of two (2) separate felonies involving the use of violence of the person," §13A-5-49(2); and (3) "[t]he Capital Offense was committed while the Defendant was engaged in the commission of, or an attempt to commit, or flight after committing kidnapping, specifically Kidnapping in *Page 1310 
the First Degree," § 13A-5-49(4). The trial court in essence found that none of the mitigating circumstances enumerated in §13A-5-51 existed, but "considered the evidence and testimony presented to the Jury and to the Court in regard to the Defendant's background and character as the same pertains to the mitigating circumstances that should be properly considered by the Court."
In finding that the aggravating circumstances outweighed the mitigating circumstances, the trial court stated:
 "After due consideration of all the matters that were presented to the Court during this hearing, both in mitigation and aggravation, and taking into consideration all other matters that are properly before the Court as herein above stated in this Order, this Court does now find and is convinced beyond a reasonable doubt and to a moral certainty that the aggravating circumstances as shown above and brought before the Court far outweigh the mitigating circumstances shown to the Court, that said aggravating circumstances outweigh the mitigating circumstances in all regards and that they are sufficient in both quantity and quality to more than uphold the Jury's verdict recommending the death penalty in this case."
We find that the evidence amply supports the trial court's findings.
In accordance with § 13A-5-53(a) and (b), we now turn to a determination of whether the death sentence was proper in this case. There has been no allegation that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and we find no evidence in the record to support such an allegation. § 13A-5-53(b)(1).
Our independent weighing of the aggravating and mitigating circumstances indicates that death was the proper sentence. § 13A-5-53(b)(2). We note that at the time this crime was committed Callahan was thirty-five years of age, had two prior convictions for assault with intent to murder, and was on probation. Although we agree with the trial judge that this offense was not especially heinous, atrocious, or cruel, it must be remembered that all capital offenses are, by their very nature, heinous, atrocious, or cruel to some extent.
The record reveals that the victim was a student at Jacksonville State University and also worked full-time. After leaving work at approximately 11:15 P.M. on February 3, 1982, she went to the Norge Village washateria to wash clothes because the pipes in her trailer were frozen and she was unable to do her laundry at home. The victim was forcefully abducted from the washateria by the defendant and carried to his trailer. A roll of gray tape was found in the parking lot of the washateria on the night of February 3. Fingerprints on this tape were identified as the defendant's. Approximately two weeks after she was abducted, the victim's body was found in a creek near the defendant's trailer. Her hands were tightly bound with white duct tape and vaginal swabs revealed the presence of human semen. The cause of her death was attributed to asphyxia, consistent with being smothered.
Considering both the crime and the defendant, we are convinced that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases. §13A-5-53(b)(3). See Musgrove v. State, 519 So.2d 565
(Ala.Cr.App.), affirmed, 519 So.2d 587 (Ala. 1986), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988);Thompson v. State, 503 So.2d 871 (Ala.Cr.App. 1986), affirmed,503 So.2d 887 (Ala.), cert. denied, 484 U.S. 872,108 S.Ct. 204, 98 L.Ed.2d 155 (1987); Ex parte Neelley, supra; Heath v.State, 455 So.2d 898 (Ala.Cr.App. 1983), affirmed,455 So.2d 905 (Ala. 1984), affirmed, 474 U.S. 82, 106 S.Ct. 433,88 L.Ed.2d 387 (1985).
Based upon our review of the entire record in this proceeding, the defendant's conviction and sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All Judges concur.
[1] In February of 1979, Callahan was convicted of assault with intent to murder and sentenced to 10 years' imprisonment. In May of 1979, he pleaded guilty and was convicted of assault with intent to murder. He was sentenced to two years' imprisonment to run concurrent with his prior sentence. In October of 1979, Callahan was granted probation.
[2] In this state, the filing of an indictment is the mechanism by which felony prosecutions are initiated. Ala. Const. of 1901, Art. I, § 8, as amended by Amend. 37 (1939); Ross v. State,529 So.2d 1074 (Ala.Cr.App. 1988); State ex rel. Baxley v. Strawbridge, 52 Ala. App. 685, 296 So.2d 779, cert. denied,292 Ala. 506, 296 So.2d 784 (1974). An indictment for this offense was not returned against Callahan until April 5, 1982. *Page 1311