The appellant was indicted for the capital offenses of intentional murder during a kidnapping in the first degree or an attempt thereof, § 13A-5-40(a)(1), Code of Alabama (1975); intentional murder during a rape in the first degree or attempt thereof, § 13A-5-40(a)(3), and intentional murder during sexual abuse in the first degree or attempt thereof, § 13A-5-40(a)(8),Code of Alabama (1975). The appellant was found guilty of all three charges and, following a separate sentencing hearing, the jury recommended a sentence of death, by a vote of eleven to one. Thereafter, the trial court determined that the aggravating circumstances outweighed the mitigating circumstances and sentenced the appellant to death.
The following rendition of the facts of this case is derived from the trial court's findings of facts from the evidence and testimony presented during the trial phase:
 "On Monday morning, January 27, 1986, at approximately 1:55 A.M., the defendant, Shep Wilson, Jr., went to the Shell Discount Food Mart at the corner of Ft. Williams Avenue and Norton Avenue in the City of Sylacauga, Alabama. The victim, Monica Cook, was working there. The defendant, Shep Wilson, Jr., struggled with Monica Cook and forcibly abducted her to his house on Papertown Road in rural Talladega County. While in his house, he savagely beat her, raped her and strangled her to death and this *Page 1239 
was done on Monday morning on January 27, 1986. The defendant, Shep Wilson, Jr., then kept her body in the apartment that Monday and Tuesday night. On Wednesday, January 29, he removed her body and put the body of Monica Cook in his mother's blue Buick automobile and went to work in Vincent in Shelby County. As he was coming home that night he took the body of Monica Cook to Riser's Farm in Talladega County, Alabama, which was approximately one to two miles from his residence and removed her body and laid her body next to a road. The defendant, Shep Wilson, Jr., then returned to his residence. On January 30, 1986, Randy Sinclair, a resident of Talladega County, found the body of Monica Cook and notified the Talladega County Sheriff's Department.
 "The conduct by the defendant constituted a brutal, aggravated, merciless and intentional killing of a woman. The murder of victim, Monica Cook, was of the intentional type while the defendant was committing kidnapping in the first degree, rape in the first degree and/or sexual abuse in the first degree."
 I II
The appellant argues that the trial court erred by allowing the district attorney to introduce hearsay testimony of a statement made by the trial court concerning appointment of counsel for the appellant. The record indicates that, during the hearing on the appellant's motion to suppress his inculpatory statements and the evidence obtained during the search of his residence and automobile, defense counsel noted that, when the appellant signed the consent to search, he had requested counsel on the prior day. Defense counsel argued that, prior to signing the consent to search, the district attorney sought to have George Sims appointed as appellant's attorney. He further argued that, when the consent to search form was signed, George Sims was not in the room with the appellant, rather Investigator Frank Strickland and the appellant were alone and someone "passing through the room" was obliged to sign as a witness. Defense counsel argued that this was all part of a "subterfuge" against the appellant.
During the hearing, District Attorney Robert Rumsey took the stand and testified concerning the appointment of counsel:[1]
 "Q [ASSISTANT DISTRICT ATTORNEY]: Back on the 14th day of February, 1986, — Excuse me — the 15th day of February, 1986, being a Saturday, did you have a conversation with Judge Jerry Fielding by telephone?
"A [RUMSEY]: Yes I did.
 "Q: Is Judge Jerry Fielding one of the two Circuit Judges for the Twenty-Ninth Judicial Circuit of Alabama?
"A: Yes, sir.
 "Q: And when you called Judge Fielding, did you make a certain request of him?
 "A: I told Judge Fielding that Shep Wilson, Jr., that he had signed an arrest warrant on him either the day before or the day before that, that he had been picked up and that he had requested an attorney; and I asked the Judge to appoint one.
 "Q: What did Judge Fielding tell you on that occasion?
 "[DEFENSE COUNSEL]: Object to going into anything that Judge Fielding said; hearsay.
 "THE COURT: This is what I'm going to do. I'm going to let it in subject to the Court making the decision whether or not it is excluded or allowed, or whatever, after I have had time to consider it. I'm going to let it in at this time and take the objection under submission.
 "Q: You knew the person you were talking to was Judge Jerry Fielding; didn't you?
 "A: Yes, sir. I recognized his voice. I have talked to him many times in person and on the telephone. *Page 1240 
 "Q: And the person you were talking to, being Judge Fielding, what did he tell you on that occasion, please sir?
 "A: He asked me if any attorneys were in the Courthouse available up here.
"Q: It was Saturday; wasn't it?
 "A: It was Saturday morning. And I said I didn't think there were any lawyers here. Sheriff Studdard was in the room with me; and he says, 'George Sims is up at his law office working on it when I came by.' I related that to Judge Fielding.
 "Q: What did Judge Fielding say to you after you related that to him?
 "A: I told Judge that Mr. Sims didn't have a telephone up there. He said, 'get him and tell him that he's appointed to represent Shep and go talk to him.'
 "Q: After you did that, what did you do, if anything?
 "A: I believe I sent Ann Wallace up the street to get George.
". . . .
 "A: I did relate that conversation to George Sims that he had, in fact, been appointed.
 "Q: And did George Sims go anywhere after you told him that?
 "A: He left the office and told me that he went over to the jail."
Thereafter, defense counsel restated his motion for mistrial and, following closing arguments on the motion to suppress, the trial court denied the motion to suppress and the motion for mistrial, stating:
 "THE COURT: I have one other thing. I am protecting my record too. You have also requested in your motions for mistrial that you want this judge's testimony about whether or not I appointed George Sims to represent Shep Wilson on February 15 prior to 10:00 a.m. If I recall, my testimony would be that I did appoint George Sims to represent Shep Wilson, Jr. on February 14. I further removed him as defense counsel prior to February 18 and appointed R.D. Pitts and Andy Redd to represent the defendant. Based on that reason I'm not going to allow you to work a mistrial due to your withholding of this issue when you had full knowledge of the appointment prior to empanelling the jury in this case, which was done Monday of this week. Now I find as a fact that you have deliberately withheld this for strategy in an effort to cause a mistrial in this case. I will certainly be glad to consider it if you want to raise this issue on motion for new trial."
Defense counsel responded to the trial court's ruling, stating that the judge had in effect made himself a witness for the prosecution and, thereby, had violated the appellant's constitutional rights because the judge was not available for cross-examination.
Although the appellant argues that Judge Fielding's statement to the district attorney regarding appointment of counsel was inadmissible hearsay, the statement was not hearsay, because it was not offered to prove the truth of the matter asserted. C. Gamble, McElroy's Alabama Evidence, § 242.01(1) (3d ed. 1977). "[M]any statements have been admitted as exceptions to the hearsay rule upon the rationale that such statements were admitted for some purpose other than to prove the truth of the statements." Id. See also Clontz v. State, 531 So.2d 60, 61
(Ala.Cr.App. 1988) (wherein a probation officer was allowed to testify that he first became aware the defendant was not at his address through a telephone call from the appellant's mother, because "the testimony was not introduced as proof of the matter asserted, but rather as the motive behind the probation officer's beginning his investigation"); Molina v. State,533 So.2d 701, 714 (Ala.Cr.App. 1988) cert. denied, 489 U.S. 1086,109 S.Ct. 1547, 103 L.Ed.2d 851 (1989) (wherein a police officer was allowed to testify to information concerning a vehicle suspected to be involved in drug activity, received through a radio dispatch, because it was not offered to prove the truth of the contents of the dispatch, but "to explain the reason he pursued and subsequently stopped the defendant");Petite v. State, 520 So.2d 207, 211 (Ala.Cr.App. 1987) (a radio broadcast, stating that a burglary was in progress, was not hearsay as it was not *Page 1241 
introduced to prove the truth of the matter asserted, "but rather for the purpose of explaining why Officer Stafford went to the property"); Thomas v. State, 520 So.2d 223, 226
(Ala.Cr.App. 1987) (wherein an officer was allowed to identify people he spoke with and places he went before finding the defendant, because "[t]he fact of the conversations . . . was offered to explain the officer's actions and presence at the scene — not for the truth of the matter asserted").
In the present case, the prosecutor testified to the fact that the trial court instructed him to appoint George Sims as counsel for the appellant, not in order to prove the truth of the matters asserted in the conversation, but to show why he approached George Sims concerning his appointment and to rebut defense counsel's argument that George Sims and he were involved in a subterfuge, whereby the appellant would be duped into consenting to the search. "A statement made out of court is not hearsay if it is given in evidence for the purpose merely of proving that the statement was made, provided that purpose be otherwise relevant in the case at trial. 5 Wigmore,Evidence, § 1361; 6 Ibid., § 1770; Motors Ins. Corp. v. Lopez,217 Ark. 203, 229 S.W.2d 228 (1950)." Bryant v. Moss, 295 Ala. 339, 329 So.2d 538, 541 (1976).
Furthermore, it was not error for the trial court to make an offer of proof as to what his testimony would have been. The trial court made the statement in response to the appellant's charges and the trial court's statement was made outside the presence of the jury. See Callahan v. State, 557 So.2d 1292
(Ala.Cr.App. 1989) (wherein the judge was allowed to testify concerning his assistance to an attorney in gaining access to the defendant while the defendant was giving his statement and concerning a portion of the defendant's statement that was overheard by the trial judge) and cases cited therein.
Despite the appellant's allegations in his brief, the trial judge was not "a necessary and material witness" and there was no ethical or legal reason for the trial judge to recuse himself. Callahan v. State, supra. In Callahan, this court determined "that the trial judge is not a material witness where there are other witnesses who are able to testify concerning the same matter." Id. at 1308. In the present case, District Attorney Robert Rumsey testified concerning the conversation he had with the trial court, relating to appointment of counsel for the appellant. Furthermore, Ann Wallace, of the district attorney's office, testified on cross-examination during the suppression hearing that she was sent by District Attorney Rumsey to contact George Sims and to instruct him that Judge Fielding wanted him to talk to someone. She further testified that she was present when District Attorney Rumsey talked to Judge Fielding on the telephone. Defense counsel then asked Ann Wallace the substance of Rumsey's conversation with the judge, and she responded, giving the substance of their conversation. George Sims also testified that Ann Wallace approached him and told him that Judge Fielding had appointed him as counsel for Shep Wilson and had instructed him to go to the jail to talk to him. He further testified that he later spoke to Judge Fielding regarding the case and was instructed to be present on a designated morning for a hearing. Thus, Judge Fielding was not a material witness.
Moreover, none of Judge Fielding's offer of proof, concerning what his testimony would have been, in any way addressed the issue of whether George Sims cooperated with the district attorney in prompting the appellant to consent to the search.
The appellant also takes issue with the trial court's finding that the question of his recusal was deliberately withheld until the hearing. While there is evidence in the record to support the trial court's determination,[2] this matter could not have prejudiced *Page 1242 
the defendant, because the trial court's statement was not made in the presence of the jury and because he acted properly in refusing to recuse himself.
Although the appellant argues that his rights to due process were violated by his inability to cross-examine the trial judge, after the judge made his offer of proof as to what his testimony would have been in denying the appellant's motion for mistrial and motion to suppress, such an argument assumes that the trial judge would have testified differently under oath. Furthermore, the appellant was not prejudiced in front of the jury, as the offer of testimony was made during a ruling on a motion regarding a question of law, outside the presence of the jury.
 III
The appellant argues that his original court-appointed counsel, George Sims, was ineffective during his interrogation by the police and his decision to consent to the search. The record indicates that the appellant was initially questioned following his arrest for possession of a pistol after conviction of a crime of violence. When the officers began asking about the present case, the appellant responded that he did not wish to talk to the officers and that he wanted an attorney. Questioning ceased and, the following day, George Sims was appointed to represent the appellant. Prior to talking to the appellant, Sims was informed by the district attorney that the police wanted permission to search the appellant's residence in connection with the present case. The appellant thereafter spoke to Sims and consented to the search. In the trial court's findings of fact and conclusions of law concerning the appellant's motion to suppress, it is noted that Sims told the appellant that if he had "anything at all to do with Monica Cook's death," he should not consent to the search. However, the appellant insisted he was not involved in Monica Cook's death and told Sims that he would consent to the search.
The trial court further noted that the appellant and Sims were present during the search of the appellant's house and that, as they were preparing to leave, the appellant approached Investigator Alvin Kidd, whom the appellant had known for some time, and asked Investigator Kidd to come by the jail later because he wished to talk to him. That evening, the district attorney learned of the request that the appellant had made of Investigator Kidd and telephoned Sims to inform him of what had happened. The district attorney asked Sims if it was all right for Investigator Kidd to talk to the appellant. Sims responded that, if the appellant wished to speak to Kidd, it was fine, and, if the appellant wanted to talk to Sims, that he would do so. Thereafter, Investigator Kidd went to see the appellant. Kidd asked if the appellant still wished to speak to him and the appellant responded that he did. Kidd advised the appellant of his Miranda rights and the trial court found that the appellant knowingly and voluntarily waived them and gave a statement.
The appellant specifically alleges that Sims was ineffective because he told the appellant to consent to the search if he did not have anything to do with the murder and in failing to ask the appellant if he had requested to speak to Investigator Kidd and to warn him of the risks of doing so.
The appellant's right to effective assistance of counsel had not yet attached under the Sixth Amendment and he did not prove ineffective assistance of counsel in regard to his Sixth Amendment right to counsel.
 "The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's *Page 1243 
skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled. Adams v. United States ex rel. McCann, 317 U.S. 269, 275, 276 [63 S.Ct. 236, 240, 87 L.Ed. 268] (1942); see Powell v. Alabama, [287 U.S. 45, 68-69, 53 S.Ct. 55, 63-64, 77 L.Ed. 158 (1932)].
 ". . . That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.
 "For that reason, the Court has recognized that 'the right to counsel is the right to effective assistance of counsel.' McMann v. Richardson, 397 U.S. 759, 771, n. 14 [90 S.Ct. 1441, 1449, n. 14, 25 L.Ed.2d 763] (1970)."
Strickland v. Washington, 466 U.S. 668, 685-86, 104 S.Ct. 2052,2063, 80 L.Ed.2d 674 (1984).
Thus the appellant's claim that he was denied effective assistance of counsel under the Sixth Amendment is contingent on whether his Sixth Amendment right to counsel, from which the right to effectiveness is derived, had attached.
 "Recognizing that the right to the assistance of counsel is shaped by the need for the assistance of counsel, we have found that the right attaches at earlier, 'critical' stages in the criminal justice process 'where the results might well settle the accused's fate and reduce the trial itself to a mere formality.' [citations omitted] and, '[w]hatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him. . . .' Brewer v. Williams, 430 U.S. 387, 398 [97 S.Ct. 1232, 1239, 51 L.Ed.2d 424] (1977). This is because, after the initiation of adversary criminal proceedings, ' "the government has committed itself to prosecute, and . . . the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." ' United States v. Gouveia, 467 U.S. 180, 189
[104 S.Ct. 2292, 2298, 81 L.Ed.2d 146] (1984)] (quoting Kirby v. Illinois, [406 U.S. 682, 689
[92 S.Ct. 1877, 1882, 32 L.Ed.2d 411] (1972)])."
Maine v. Moulton, 474 U.S. 159, 170, 106 S.Ct. 477, 484,88 L.Ed.2d 481 (1985).
In the present case, when the appellant consented to the search, approached Investigator Kidd, and subsequently gave a statement to Investigator Kidd, judicial proceedings had not been initiated against him. The appellant was only a suspect in the murder of Monica Cook, although he had been arrested on the charge for possession of a pistol after conviction for a crime of violence.
 " 'The fact that a defendant has an attorney does not mean, as a per se rule, that law enforcement officials may not question the defendant without prior notice to or consent from the attorney. Eakes v. State, 387 So.2d 855, 860
(Ala.Cr.App. 1978). A suspect's retained counsel's consent or presence need not be obtained for pre-indictment custodial interrogation of the suspect. Moran v. Burbine, [475 U.S. 412], 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Miranda does not create 'an undifferentiated right to the presence of an attorney that is triggered automatically by the initiation of the interrogation itself.' Burbine [475] U.S. at [433], n. 4, 106 S.Ct. at 1147, n. 4. Here, the interrogation sessions took place before the initiation of adversary judicial proceedings and [the defendant's] Sixth Amendment right to counsel had not attached. Burbine, [475] U.S. at [429-30], 106 S.Ct. at 1145." *Page 1244 
McCall v. State, 501 So.2d 496, 500 (Ala.Cr.App. 1986).[3]
The pre-indictment custodial interrogation, in which the appellant consented to the search, as well as the appellant's pre-indictment statement voluntarily given to Investigator Kidd, did not trigger his Sixth Amendment right to counsel, as adversary judicial proceedings had not been initiated against him.[4]
As to appellant's Fifth Amendment right to counsel, because the appellant had been informed that he had a right to counsel prior to custodial interrogation, and had invoked that right, his Fifth Amendment right had attached. Since appellant had an underlying federal constitutional right to counsel prior to custodial interrogation, he had a right to effective counsel. Compare Pennsylvania v. Finley, 481 U.S. 551, 107 S.Ct. 1990,95 L.Ed.2d 539 (1987) (because petitioner had only a state-created, statutory right to counsel on collateral attack of conviction, he had no right to insist on federal procedures designed to protect that right).
Appellant did not, however, carry his burden of proving that he was denied the effective assistance of counsel. Counsel is not ineffective for advising his client to tell the truth,Nix v. Whiteside, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123
(1986), or — believing that his client has no involvement in the charged offense — for advising him to cooperate with the authorities. See Phelps v. State, 435 So.2d 158
(Ala.Cr.App. 1983).
 "Erroneous, incomplete, or poor advice or consultation regarding an accused's pretrial silence may demonstrate and support a finding of inadequate assistance of counsel. Annot., 7 A.L.R. 4th 180, Section 20 (1981). However, the mere fact that counsel advised the accused to make a statement to the police does not constitute inadequate representation as a matter of law. See 7 A.L.R. 4th at Section 19."
Phelps v. State, 435 So.2d at 161.
Counsel was also not ineffective for failing to "warn [appellant] of the risks of" speaking to Investigator Kidd. As this Court observed in Phelps v. State:
 "Although the defendant argues that counsel should have informed him of the consequences of making a confession, that is one of the functions of the Miranda warnings. 'The Miranda warnings are given not solely to make the suspect aware of the privilege, but also of the consequences of forgoing the privilege.' United States v. McCrary, 643 F.2d 323, 329 (5th Cir. 1981). 'Miranda implicitly assumes that it is possible for the police to convey to the accused sufficient understanding of his rights to enable him to make an intelligent waiver."
Id. at 162.
Thus, the appellant did not prove that his counsel acted in an ineffective manner under the Fifth Amendment claim.
 IV
The appellant argues that his confession was inadmissible as a violation of his Fifth, Sixth,[5] and Fourteenth Amendment rights, in that, he says, he did not knowingly, intelligently, and voluntarily waive his right to counsel. Moran v. Burbine, supra. The appellant specifically argues *Page 1245 
that he did not initiate the contact with Investigator Kidd and that, even if he did initiate the conversation with Kidd, his waiver ceased when there was a break in the interrogation.[6] He further argues that the waiver was not voluntary because of the duration of the interrogation, the fact that he was exhausted, and the fact that he was mistreated. To support his argument, the appellant introduced the testimony of one of his cousins during the case in chief, who stated that, although he attempted to visit the appellant, he was told by the authorities for several days that the appellant was not allowed visitors.[7] The appellant further argues that he threatened suicide in an attempt to bring attention to the treatment which he received from the authorities, leading to his confession. However, the trial court made the following findings of fact concerning the appellant's statements:
 "The defendant, who was still in custody, and his attorney were present during the search of the defendant's house on February 15, 1986. That afternoon, after most of the search had been completed and as the defendant and his attorney were preparing to leave, the defendant walked over to where investigator Alvin Kidd was standing. The defendant told investigator Kidd to come by later to see the defendant because the defendant wanted to talk to him.
 "Investigator Kidd had known the defendant for some time and was a good friend of the defendant's uncle. The defendant's statement to investigator Kidd at the scene of the search was unsolicited and was entirely voluntary on the defendant's part. The defendant approached investigator Kidd and asked him to talk to him later for two reasons. First, the defendant wanted to find out what had been discovered in the search of his home and to find out what the person who lived in an adjoining room had said to the investigators. Second, the defendant had spoken to investigator Kidd after being warned of his Miranda rights on prior occasions when he was suspected of other crimes, and on every one of those occasions after talking with investigator Kidd the defendant was not charged. No officer or agent of the State did anything to prompt the defendant's statement to investigator Kidd on the afternoon of February 15, 1986, requesting investigator Kidd to come see him because he wanted to talk to him. The defendant himself initiated further contact in conversation. After 9:00 p.m., on the evening of February 15, 1986, the district attorney learned of the statement that the defendant had made to investigator Kidd earlier that afternoon. The district attorney called attorney Sims and informed him of what the defendant had said to investigator Kidd. The district attorney asked attorney Sims if it was all right for investigator Kidd to talk with the defendant. Sims told the district attorney that if the defendant wanted to talk with Kidd it was fine, and if the *Page 1246 
defendant wanted to talk to Sims he would come down. That conversation took place between 10:00 p.m. and 11:00 p.m. on February 15, 1986. Between 11:00 p.m. and 11:30 p.m. investigator Kidd went to see the defendant. Kidd began by asking the defendant if he still wanted to talk with him, and the defendant said yes. Kidd then advised the defendant of his Miranda rights, and the defendant knowingly and voluntarily waived them. Kidd then reminded the defendant that he had an attorney and told the defendant that if he wanted to see his attorney the attorney would be brought to see him. The defendant told Kidd that he wanted to talk with him without the attorney being present. The defendant's decision to talk to investigator Kidd and to talk to him without his attorney being present was knowingly and voluntarily made without any coercion or inducement by any officer or agent of the State. The defendant initially told investigator Kidd that he did not have anything to do with Monica Cook's death. He described at length his activities at the time of the crime and gave the name of an alibi witness. That alibi witness was found and questioned by investigators while the defendant was talking to Kidd. The witness did not support the claimed alibi. During their conversation, investigator Kidd told the defendant about some of the incriminating evidence that had been found at the defendant's house. . . .
 "Shortly, thereafter, the defendant made the incriminating statements that were introduced at trial. The defendant began making those incriminating statements to investigator Kidd at approximately 2:30 a.m. on February 16, 1986 and he finished at approximately 3:15 a.m. The statements were then repeated into a tape recorder beginning at 3:35 a.m. and ending at 4:05 a.m.
 "The defendant made the incriminating statements that were introduced at trial after knowingly and voluntarily waiving his Miranda rights and after knowingly and voluntarily waiving his right to have his counsel present. At all times while he was being questioned, the defendant knew that he was free to stop the questioning or to consult with his attorney but he chose not to do so. He made the incriminating statements voluntarily and without any coercion or inducement from investigator Kidd or any other officer or agent of the State. No one promised him any leniency or better treatment if he would confess. No one coerced him in any way. The defendant was acquainted with investigator Kidd and was not in any way intimidated by him. Before he began talking with investigator Kidd, the defendant had had supper and he had laid around his jail cell. He was rested. The defendant was free to move about the room while being questioned, and he did so. He was free to go to the rest room, and he did so. He was asked if he wanted coffee and he said yes and he was given coffee. He was not denied any comfort he requested. He was not physically exhausted. The incriminating statements the defendant made were not affected by his physical conditions, his surroundings, or the lateness of the hour."
When an accused expresses his desire for counsel, pursuant toMiranda v. Arizona, supra, all interrogation by the police must cease until counsel is made available to him. Oregon v.Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). In the instant case, when the appellant requested counsel during interrogation concerning Monica Cook's murder, all questioning ceased, until George Sims was appointed and consulted with the appellant at the jail. Thus, the appellant was properly provided with access to an attorney. "The stringent test of waiver as mandated by the Supreme Court and the Fifth Circuit was designed specifically for situations in which an accused does not have the safeguard of a knowledgeable attorney to represent his interest. In instances where such an attorney does appear, as here, that test no longer controls."Bartlett v. Allen, 724 F.2d 1524, 1528 (11th Cir. 1984).
Moreover, the appellant's statements to Investigator Kidd were properly allowed *Page 1247 
into evidence and did not violate his Fifth or Fourteenth Amendment rights, because he initiated the conversation with Investigator Kidd. The record indicates that the appellant approached Investigator Kidd, during the search, and requested him to come by the jail in order to speak with him. The appellant's attorney was made aware of the appellant's initiation, prior to the actual conversation. On the night of their meeting, and prior to taking the statement from the appellant, Investigator Kidd again asked the appellant if he wished to speak to him. He further read the appellant hisMiranda rights again and specifically reminded him that his attorney could be present, if the appellant wanted him to be. The appellant responded, "I will talk to you," and indicated that he wished to speak to Investigator Kidd without his counsel being present.
"[A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880,1884-85, 68 L.Ed.2d 378 (1981). A knowing and intelligent waiver cannot be found once the Fifth Amendment right to counsel has been clearly invoked unless the accused initiates the renewed contact. United States v. Massey, 550 F.2d 300 (5th Cir. 1977). In Oregon v. Bradshaw, 462 U.S. 1039,103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), the United States Supreme Court addressed the determination of whether a defendant "initiated" further conversation with the police, such that it would suffice to show a waiver of a previously asserted right to counsel. The court held that the defendant's comment or "initiation" must be "not merely a necessary inquiry arising out of the incidents of the custodial relationship" but rather it must "[e]vince a willingness and a desire for generalized discussion about the investigation". 462 U.S. at 1045-46,103 S.Ct. at 2835.
Under the totality of the circumstances in the present case, the evidence indicates that the appellant knowingly and intelligently waived his right to counsel by initiating conversation with Investigator Kidd; stating that he wished to speak without his attorney present; and initially stating, "Mr. Kidd, I ain't done nothing." Such a statement indicates a desire "for a generalized discussion about the investigation."
Moreover, despite the appellant's allegations, the trial court properly found that the appellant's statement was voluntary. The officers who were present during the appellant's statement all testified to a lack of threats or coercion by the authorities; further, although Investigator Kidd testified that the appellant appeared to be tired, he testified that he did not appear exhausted. Although the appellant testified that he asked several times during this session for his attorney and to return to his cell, Investigator Kidd, Ann Wallace, and Frank Strickland all testified that they heard the entire questioning and that the appellant never made those requests. Sheriff Jerry Studdard, Dennis Surrett, and Clarence Haynes testified that they heard most of the session and denied that the appellant ever made those requests. Furthermore, these witnesses all refuted the appellant's testimony that Sheriff Studdard was "sticking" him with a round, metal object and that he choked the appellant while Clarence Haynes held the appellant's arms behind his back.
"Because the evidence concerning voluntariness was conflicting, great weight must be given to the trial court's judgment. Blackburn v. Alabama, 361 U.S. 199, 208,80 S.Ct. 274, 281, 4 L.Ed.2d 242 (1960)." Sandifer v. State,535 So.2d 203, 205 (Ala.Cr.App. 1987).
 "Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. Chambers v. State, 455 So.2d 1008
(Ala.Cr.App. 1984); Bennett v. State, 409 So.2d 936
(Ala.Cr.App. 1981), cert. denied, 457 U.S. 1137
[102 S.Ct. 2968, *Page 1248 73 L.Ed.2d 1356] (1982). The trial court need only be convinced from a preponderance of the evidence to find a confession to have been voluntarily made. Ex parte McCary, [Ms. 86-1219, January 15, 1988] [528] So.2d [1133] (Ala. 1988); Ex parte Singleton, [465 So.2d 443 (Ala. 1985)]."
Bui v. State, 551 So.2d 1094, 1107-08 (Ala.Cr.App. 1988). Under the totality of the circumstances, "[t]his court is not convinced that the trial court's conclusion is palpably contrary to the great weight of the evidence and manifestly wrong, and the trial judge's finding will not be disturbed on appeal." Sandifer v. State, supra, citing Harris v. State,280 Ala. 468, 470-71, 195 So.2d 521 (1967).
 V
The appellant argues that the prosecutor deliberately used his peremptory challenges to strike 12 of the 16 potential black jurors from the jury.[8] The appellant further argues that this behavior is consistent with the State's "pattern of exclusions in Talladega County within the last five years", and, therefore, that a prima facie violation of Batson v.Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), was established.
The record indicates that the trial court never determined whether the appellant established a prima facie case of purposeful discrimination by the State; however, the prosecutor came forward with reasons for his strikes of the blacks. The appellant introduced statistics concerning the number of blacks struck and the percentages derived from the number of those strikes compared to the total number of blacks on the venire in jury trials dating between 1981 and 1985 in Talladega County, in order to prove a prima facie case of purposeful discrimination by the prosecutor. Although, as noted by the State, this evidence shows that the State's striking was highly inconsistent and therefore fails to show a pattern of striking blacks,[9] because the State presented reasons for their strikes, we will determine whether the State met its burden of proof. However the State's burden only became necessary upon the appellant's fulfilling its burden of proof by establishing the prima facie showing. Batson v. Kentucky, supra.
Prior to giving his reasons for the peremptory strikes exercised against blacks, the prosecutor stated that he used information developed during the voir dire examination, as well as information from investigators and law enforcement officers, several of them black, on whom the district attorney's office typically relied. The following reasons were given by the district attorney for his strikes of blacks:
 Mary J. Barber: She stated that she was kind to the defendant and a good friend of his mother and him. Furthermore, she stated that she could not put her relationship aside to render a verdict based strictly on the law and the evidence. Upon questioning by defense counsel, however, she changed her mind and stated that she could follow what the judge told her to do. The prosecutor feared this inconsistency.
 Dorothy B. Dudley: She is the niece of a man who had been prosecuted within the last three months and received over 20 years' imprisonment for possession of cocaine and marijuana. She stated that she did not know that he had been prosecuted and the district attorney indicated that he did not believe that she was being candid. The prosecutor further *Page 1249 
stated that he generally struck anyone having a relative whom he had prosecuted; however, he noted that he did not strike a Mr. Curlee, in the present case, although he had prosecuted his brother. He further stated that Mr. Curlee's brother had been prosecuted for burning down another brother's house, but that his family appeared content that he had gotten probation. The prosecutor further explained that he had also prosecuted Dorothy Dudley's first cousin and that one of the State's main witnesses in the instant case had been the chief investigator in that case. Moreover, the prosecutor noted that he struck two white males from the jury, Mr. Latham and Mr. Roberson, because he had either prosecuted, or been involved in the prosecution of, one of their relatives.
 Robert E. Scott: He had been prosecuted on numerous misdemeanor cases and law enforcement officers had indicated that he was related to a Bo Scott, who had been prosecuted on two or three instances. Another investigator informed the district attorney that he had prosecuted Scott's brother on a child molestation case previously. A black investigator informed him that Robert Scott would not be a good juror. Furthermore, he had indicated that he was opposed to capital punishment. He also stated that he did not want to serve on this jury, in response to one of the district attorney's questions, and the district attorney stated that he struck every black and white, that was not struck by the defense counsel, who indicated that they did not want to be included on the jury, if they were not needed.
 Willie L. McCluney: Black investigators had indicated to the district attorney that McCluney's family had had a number of problems with the law; including Moses McCluney, who was prosecuted and convicted of murder. Furthermore, Willie McCluney stated that he did not wish to sit on this case.
 Charlotte L. Ball: The sheriff informed the district attorney that she would not make a good juror. She stated that she did not wish to serve on the jury and, on the first day, she indicated that she had a small child and no one to care for the child and attempted to get excused. Furthermore, one of her young relatives had been involved in a burglary and was shot by the proprietor of the grocery store. She attempted to get a warrant for the grocer's arrest, but the man was not indicted and she was very unhappy.
 Arnice T. Pearson: One of her good acquaintances, a school teacher, told the district attorney that she would not make a good juror. Further, an investigator stated that she was related to a Pearson who was prosecuted on a case involving the sexual abuse of a child.
 Mary W. Thomas: An employee of the district attorney's office indicated that she would not be a good juror for the State in this type of case, meaning one involving capital punishment. She further stated on voir dire that she had heard about the case and did not wish to sit in judgment on it.
 William S. Beasley: The district attorney stated that he appeared to be "real young," approximately 19 years of age. He stated that two white females were also struck because they appeared to be very young. He indicated that he did not like "real young people" sitting in a jury on a capital punishment case.[10] Moreover, Beasley had recently been investigated and prosecuted for his involvement in a "dope scam."
 Willie T. Bradford: He had attempted to be excused from the case and also indicated he could not read or write. The district attorney challenged him and the judge indicated that he would excuse him, but, after questioning by the defense counsel, he indicated that he could read the numbers on his pay check as to amounts of money and could recognize his name and his employer's name, but he could not read the Bible. The district attorney further stated that, because of his inability to read and write, and because *Page 1250 
much of the evidence in the present case was quite technical, he was concerned about Bradford's ability to understand the evidence. Furthermore, Bradford's employer indicated that he did not think that Bradford would make a good juror in the case.
 Charles Smiley: He indicated that he did not wish to serve on the jury and that he did not think he could impose the death penalty. The district attorney also struck a white female, Joyette Rickman, for that reason. Further, Smiley worked at Talladega College and was a good friend of two professors who were assisting in the appellant's case.
 J.C. Patton: On the first day, he asked to be excused. Two black investigators and a deputy told the district attorney that he would not make a good juror. Furthermore, he had been prosecuted, and may have pleaded guilty, on a gambling charge.
 David Garrett: He served as an alternate. He then had to serve as one of the twelve jurors because of the illness of another juror, who was excused without objection during closing arguments. He has seven misdemeanor convictions in City court and a black investigator informed the district attorney that he would not make a good juror. Furthermore, he is related to Walter Hugh Garrett, who was on the docket and charged with rape in the first degree. He also attended high school with the appellant's sister. The district attorney had also prosecuted someone for killing his sister, who was only convicted of manslaughter and received a light sentence. The district attorney had reason to believe that Garrett was not happy with that outcome, based on his comments to defense counsel during voir dire.
These reasons were sufficiently specific and race neutral. See Ex parte Lynn, 543 So.2d 709 (Ala. 1988).
 " '[T]he prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause.' Batson, supra, 476 U.S. at 97
[106 S.Ct. at 1723]. It is within the sound discretion of the trial court to determine if the State's peremptory challenges of black jurors are motivated by intentional racial discrimination. Ex parte Jackson, 516 So.2d 768 (Ala. 1986). Moreover, the trial court's findings as to whether the defendant has established purposeful racial discrimination are to be accorded great deference on appeal, Batson, supra, 476 U.S. at 98 [106 S.Ct. at 1723], and should be reversed on appeal only if they are clearly erroneous. Ex parte Branch, 526 So.2d 609
(Ala. 1987)."
Ex parte Lynn, supra, at 712. See also Scales v. State,539 So.2d 1074 (Ala. 1988).
 VI
In accordance with § 13A-5-53, Code of Alabama (1975), we have reviewed the record, including the guilt and sentencing proceedings, for any error which adversely affected the rights of the appellant, and we have found none. Nor do we find any evidence that the sentence was imposed under the influence of passion, prejudice, or any arbitrary factor.
The trial court found the existence of two aggravating circumstances: that the defendant had previously been convicted of a capital offense or another felony involving the use or threat of violence to the person; and that the offense was committed while the appellant was engaged in the commission of, or an attempt to commit, kidnapping in the first degree and rape in the first degree. The trial court's reasons for finding these two aggravating circumstances are amply supported by the evidence.
The trial court properly found the existence of no mitigating circumstances as defined in § 13A-5-51(1), Code of Alabama
(1975). The trial court also considered evidence offered by the appellant, including evidence of anti-social personality, and portions of the pre-sentence report which were favorable to the appellant on mitigation, in order to determine whether any aspect of the appellant's character or record or any circumstance of the offense would have constituted a non-statutory mitigating circumstance. The trial court found none. The trial court's findings concerning the *Page 1251 
statutory and non-statutory mitigating circumstances are supported by the evidence.
The trial court also considered the jury's recommendation of the death sentence, the evidence offered by the appellant, and the pre-sentence investigation report, before determining that the aggravating circumstances outweighed the absence of mitigating circumstances. This court's independent weighing of aggravating circumstances and the absence of any mitigating circumstances supports the trial court's conclusion and indicates that death was the proper sentence.
The sentence of death in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. For murder during kidnapping, see Thompson v. State, 542 So.2d 1286
(Ala.Cr.App. 1988) affirmed, 542 So.2d 1300 (Ala. 1989); Neelleyv. State, 494 So.2d 669 (Ala.Cr.App. 1985), affirmed,494 So.2d 697 (Ala. 1986), cert. denied, 480 U.S. 926, 107 S.Ct. 1389,94 L.Ed.2d 702 (1987); Heath v. State, 455 So.2d 898
(Ala.Cr.App. 1983), affirmed, 455 So.2d 905 (Ala. 1984), affirmed, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985). For murder during rape, see Thompson v. State, supra; Freemanv. State, 555 So.2d 196 (Ala.Cr.App. 1988); Bradley v. State,494 So.2d 750 (Ala.Cr.App. 1985), affirmed, 494 So.2d 772
(Ala. 1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385,94 L.Ed.2d 699 (1987); Dunkins v. State, 437 So.2d 1349
(Ala.Cr.App.), affirmed, 437 So.2d 1356 (Ala. 1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1329, 79 L.Ed.2d 724 (1984).
The record is devoid of any indication of plain error. Therefore, the appellant's judgment of conviction and sentence of death were proper. The judgment of the circuit court is affirmed.
AFFIRMED.
All the Judges concur.
[1] We note that this testimony was made during the motion to suppress, and outside of the presence of the jury. Cf. Tarverv. State, 492 So.2d 328 (Ala.Cr.App. 1986); Waldrop v. State,424 So.2d 1345 (Ala.Cr.App. 1982), appeal after remand,462 So.2d 1021 (Ala.Cr.App. 1984), cert. denied, 472 U.S. 1019,105 S.Ct. 3483, 87 L.Ed.2d 618 (1985).
[2] The re-direct examination of George Sims, during the suppression hearing, makes it clear that he had previously spoken to one of the defense lawyers about Sims's actions just prior to and during the search of the appellant's house. Thus, the defense counsel were aware that George Sims had represented the appellant, despite their claim made in motion for mistrial, that because George Sims's name does not appear on the case action summary of the appellant's case concerning possession of a pistol after having been convicted of a felony involving violence, they could not have known whether he was appointed and whether Judge Fielding might be required to testify concerning the appointment. It further seems unlikely that the defense lawyers would have failed to question George Sims as to whether he was appointed, in light of their claim that, prior to the suppression motion, they had been "pursuing the implications, the appearance or possibility of collusion between the police or the district attorney and the 'police appointed counsel' ".
[3] In Maine v. Moulton, 474 U.S. at 171, 106 S.Ct. at 484, the Court noted that in Spano v. New York, 360 U.S. 315,79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), four Justices in two concurring opinions, "reasoned that to permit police to 'produce the vital evidence in the form of a confession which is useful or necessary to obtain a conviction' in the absence of counsel,after the right to counsel has attached, is to deny the accused 'effective representation by counsel at the only stage when legal aid and advice would help him.' Id., at 325-26,79 S.Ct. at 1208-09 (Douglas, J., concurring, joined by Black and Brennan, JJ.); see also, id., at 326-27, 79 S.Ct. at 1209
(Stewart, J., concurring, joined by Douglas and Brennan, JJ.)."
[4] See Morris v. Slappy, 461 U.S. 1, 14, n. 6, 103 S.Ct. 1610,1617, n. 6 (1983) (wherein the United States Supreme Court held that there is no Sixth Amendment right to a "meaningful attorney-client relationship").
[5] Initially, we note that, as discussed in regard to the previous issue, the appellant's Sixth Amendment right to counsel had not yet attached, as formal adversary proceedings had not been initiated.
[6] The appellant's reference to a "break in the interrogation" will be treated as referring to the time between his request for counsel on February 14 and his statements made to the authorities on February 15. Investigator Kidd indicated initially, on direct examination by defense counsel during the suppression hearing, that after he had spoken with the appellant for approximately an hour on February 15, he left for about an hour and the appellant was returned to the jail for the hour before continuing with the interview. However, this testimony was given around midnight, after approximately fifteen hours of court, and Investigator Kidd testified the next day that he had been confused about the time and that he had testified incorrectly. He stated that after the interview had begun, no break was taken and that the appellant and he were present until the statements were completed. This discrepancy was a matter for the trial court in determining admissibility and we find no abuse in the trial court's actions. Further, the appellant testified during this hearing and did not indicate that there was any break in this session and stated that he never left the interrogation room after the questioning began. Two other State's witnesses, Ann Wallace and Frank Strickland, so testified.
[7] A jailer testified for the defense, during the suppression hearing, that it was an ordinary rule at the jail that no visitors, other than attorneys or ministers, were allowed. Further, the appellant's cousin stated that he had an extended conversation with the appellant on February 15 during the search of his home and again on February 18 when the appellant threatened suicide.
[8] The record indicates that the prosecutor struck eleven black veniremembers, with one remaining on the jury and serving as an alternate juror. Three black veniremembers were also stricken for cause by the State or the appellant.
[9] On voir dire examination by the prosecutor, the defense witness conceded that he could not say that his list was accurate and conceded that there were some mistakes. Furthermore, the list did not indicate whether the defendant in each case was black or white. The list also included each case in which the district attorney was present in the courtroom, whether he participated in the striking process or not. There was one case listed in which, although there were 14 blacks on the venire, the State struck no blacks. However, the general range for the percentage derived from the number of blacks struck by the State compared to the number of blacks present on the venire, was from 82 percent to 33 percent.
[10] Although the appellant argues that the prosecutor allowed young whites to sit on the jury, those whites were adjudged to be approximately 30, and at least 25, years of age.